## Celenza's Estate.

The facts appear from the following extract from the adjudication of

LAMORELLE, P. J., Auditing Judge.—Michael Celenza, also known as Michele Celenze, died April 30, 1929, having first made a will, dated January 10, 1929, of which he appointed Grazia Ruccia executrix, to whom letters testamentary were granted September 11, 1929.

Testator gave, devised and bequeathed "unto my beloved companion Grazia Ruccia, 5004 Thompson St., the profits of my business situated at 5010 and 5012 Lancaster Avenue and house at 5004 Thompson St., all in Philadelphia, Pennsylvania, also whatever movible personal propertys shall be at the time of my death, in Philadelphia, Penna.

"From the said propertys she shall get the sum of two thousand dollars ($2000) which shall go to my friend Giuseppe Ruccia residing at 931 Easter Ave., Baltimore, Md. At her death the above mentioned propertys shall be divided in three equal parts to my beloved nephews and niece being them a great deal of help to me in building the business that I am in at the present time. One third (⅓) to Giuseppe Celenza of Nicola, 1304 N. Farson St., Phila., Penna., one third (⅓) to Giuseppe Celenza of the dead Pietro, 106 Harrison Ave., Garfield, N. J., and one third (⅓) to Rita Celenza of Nicola married Cangi."

This was followed by three devises of real estate situate in Italy, one of them being to his wife, Concetta Basilica, and he also provided as follows: "from my propertys in this country of America of North, she [referring to his wife] shall get the sum of two dollars ($2) because after me sending for

her several times to come to this country of North America, she always refused to come."

The intention of testator is crudely expressed. In the outstart he gives certain real estate, without specifying whether for life or in fee simple, the profits of his business, without specification as to time, all movable personal property in Philadelphia, without specifying whether for life or absolutely, and after a pecuniary bequest, directs that at her death "the above mentioned properties" shall be divided equally between two nephews and one niece. The auditing judge is of opinion and so rules that he intended to give *all* his personal property to Grazia Ruccia for life, and at her death to give it to the two nephews and one niece absolutely. The real estate is not before the auditing judge, and it is, therefore, unnecessary to decide whether that was given for life or in fee simple. As life tenant, Grazia Ruccia has the power to dispose of the stock of the business and to buy other stock in its place and sell that and so on, for in no other way can any profits be made. The remaindermen at her death are entitled to the value of the property at the time of the death of testator.

Two of the questions that arise in this case are whether Concetta Celenza is entitled to the widow's exemption of $500 and one-half of the net balance of the estate. There was offered in evidence a certified copy, under the Acts of Congress, of the certificate of marriage and also that portion of the will which reads "my wife Concetta Basilica," and counsel for said Grazia Ruccia, although objecting to this evidence, finally admitted that the said Concetta Celenza is the widow of testator.

Testator was an Italian, and he came to this country in 1902. He left his wife and one child in Italy, and neither of them has ever come to this country. Testator, at the time of his death, was a citizen of the United States, and his domicile was in Philadelphia. The devolution of his estate is, therefore, governed by the laws of the State of Pennsylvania.

There was offered in evidence two elections to take against the will. Both of them are signed by Domenico Basilica as attorney in fact for the widow. One of them is sworn to and the other is not. One of the questions presented for determination is whether an election to take against a will must be signed by the widow herself or whether an election signed by an attorney in fact is sufficient. Section 23 (b) of the Wills Act of 1917, P. L. 410, as amended by the Act of April 2, 1925, P. L. 118, provides as follows: "A surviving spouse electing to take under or against the will of the decedent shall, in all cases, manifest the election by a writing signed by him or her, duly acknowledged before an officer authorized by law to take the acknowledgment of deeds, and delivered to the executor or administrator of such decedent within one year after the issuance of letters testamentary or of administration. Neglect or refusal or failure to deliver such writing within said period shall be deemed an election to take under the will." The act provides, in terms, that the surviving spouse manifest the election by a writing "signed by him or her."

Before discussing the question whether an election can be made by an attorney in fact, a minor question must be considered, and that is whether, under the power of attorney, which was offered in evidence, the right to make an election is conferred. The power of attorney provides, *inter alia*, as follows: That the appointee shall have the power "to institute and follow, until final determination, all required, opportune and necessary acts by the law required and requested for the liquidation and proper distribution and disposition of the succession of the inheritance left by her husband, Michele Celenza (son of Pasquale Celenzo, Deceased), gardener, who died as above stated, on

April 29, 1929 in Philadelphia Pennsylvania," and "I declare finally and expressly that this Power of Attorney to have from this moment henceforth all the powers necessary for him (the said Domenico Basilico), to do all and anything that I might or could do if personally present under the requirements and obligations of the law, hereby ratifying and confirming as good, valid and effectual all and everything that I might or may, or will do, by reason hereof, and, in general, to do and perform all matters and things, transact all business, make, execute and acknowledge all contracts, orders, deeds, writings, assurances and instruments, which may be requisite or proper to effectuate all or any of the premises, or any other matter or thing pertaining or belonging to me or to the Estate, with the same powers and to all intents and purposes with the same validity as I could if personally present, and hereby ratifying and confirming whatsoever my said Attorney or his substitute or substitutes shall and may do by virtue hereof in the premises." No specific authority is conferred upon the appointee to make an election. Counsel for the widow contends that it would be reasonable to expect express mention of the right to elect to take against the will because it would be necessary to attribute to the widow and her Italian advisers a knowledge of the law of Pennsylvania, which would be unattainable without previously being informed thereof. Numerous authorities are quoted by Mr. Miller and also by Mr. Friedman, representing Grazia Ruccia. In the opinion of the auditing judge, the language of the power is sufficiently broad to confer upon the appointee every power that is necessary to be exercised to protect her interest in the estate. She intended to confer upon the appointee all the power to do anything that she might herself do. There is nothing in the record to show that the widow contends that no such authority was delegated, and in the opinion of the auditing judge, it does not lie in the mouth of Grazia Ruccia to raise this question. Coming back to the main question, the auditing judge calls attention to the decision in Madden's Estate, 25 Dist. R. 155. This case arose, it is true, prior to the passage of the Act of 1917, but in the opinion of the auditing judge can still be considered as a precedent. In that case the widow was a lunatic and was not represented when the account of the executor was audited. Thirteen years after the audit, proceedings in lunacy were instituted and a committee was appointed and that committee asked for leave to file an election to take against the will, and the petition was granted. If the argument of Mr. Friedman, that in all cases an election must be signed personally by the surviving widow or husband, a committee for a lunatic or a guardian for a minor will have no power to file an election. A foreigner, not acquainted with our laws, is in the same category. There is no proof that the widow knew the laws of Pennsylvania, and the power of attorney was, therefore, made so broad that the appointee could do anything that she herself could do. The auditing judge does not, however, rule that in all instances an election may be signed by the appointee of a power. All he decides is in exceptional instances that an election need not be signed by the widow personally but can be signed and acknowledged by her attorney in fact, and that this case is exceptional in its character. The auditing judge, therefore, rules that the election has been properly made. The authorities cited by Mr. Friedman do rule that the right to make an election is a personal privilege, and being a personal privilege, it dies with the person. The personal representatives of a decedent's lunatic spouse cannot, therefore, make an election after the death of the spouse: see McClintock's Estate, 240 Pa. 543, Crozier's Appeal, 90 Pa. 384, and Roberts's Estate, 82 Pa. Superior Ct. 251. These cases, however, do not decide that the widow

cannot delegate her authority, while she lives, to make the election, nor that an election cannot be made on behalf of the surviving spouse where he or she labors under some disability.

In this connection, although the question is not raised, it may be noted that the right of the widow to claim the exemption is also a personal privilege. The exemption claim, however, is frequently granted at the audit on the application of counsel for the widow. While it is personal, it is not personal in the sense that she cannot, while living, authorize someone to claim it for her.

It is contended by Mr. Friedman that the credible evidence shows that the widow willfully and maliciously deserted decedent for a period of a year and upwards prior to his death, and thereby forfeited her right to share in his estate.

The evidence on this subject is conflicting. The marriage having been proved, the burden of proof is on the one who alleges that a desertion took place. From the testimony offered for the widow, it appears that testator left Italy in 1902; that he was married to the present claimant at that time and had a son then between two and three years old; and that the wife and son did not accompany him to America. His wife was left without any means to support herself and their child, and she went to the home of her brother and continued to live there. Domenico Basilica, a nephew of the claimant, testified that at the request of his aunt and at a time when he was eight years old he wrote letters for his aunt, and in those letters she asked her husband why he did not send her money to support her in Italy, and requested him "to send her money to support her over there or to send money because she wanted to come to this country." He fixed the time of the writing of these letters as 1907; and stated he wrote the letters for her; that he mailed them and the number of them was five or six. Letters mailed are ordinarily duly delivered, and taking into consideration the testimony of Camillo Cerulli, hereinafter referred to, the auditing judge finds as a fact that the letters were written and duly received by testator.

Camillo Cerulli, who also testified on behalf of the widow, stated that he was not related to her; that he came to Philadelphia in 1902 and saw testator about three years thereafter; that he received many letters from Mrs. Celenza; that one of these letters, received in 1905 or 1906, he showed to testator; that testator read the letter; that in it Mrs. Celenza said "what is the matter? You don't give me any support. I want support." He testified, further, that he received letters from the wife both before and after this one, asking for support, and when he told testator he had a letter from his wife, testator replied that if the witness wished to be a good friend of his that he should not say anything more to him about his wife.

No evidence was offered by counsel for Grazia Ruccia that in response to the request for support he sent the wife any money for that purpose, either at or about that time or at any time prior to his death.

Domenico Di Phillipa, a witness for Grazia Ruccia, testified that testator was unable to write and he wrote a letter for testator in 1906 or 1907, addressed to his wife, "to ask his wife if she won't come over to the United States. If so, he would send money to her for a steamship ticket, her and the son; that he received no reply for over two months;" that two months later he wrote another letter for him, in which testator asked her "why don't you reply to my letter;" that a letter was received from her in reply, in which she said, "I don't like to come to the United States to see you and I won't send my boy to you;" and that he gave the letters he wrote to testator

and testator mailed them, but when asked whether he went to the post office with testator, he made no direct reply, but answered, "He received a letter back from Concetta Celenza."

Another witness for Grazia Ruccia, Dominic Finelli by name, testified that at the request of testator he wrote two letters to her "from 1905 to 1906," asking her "whether she would come over to this country;" that the letters he wrote testator took; and when asked whether he saw him mail the letters, he answered, "I don't know when I wrote the letter, then he put a stamp on it and said I will take care of it and mail it himself. That is all that he told me." In the absence of any evidence of the mailing of the letters, this evidence is irrelevant.

The evidence of Domenico Di Phillipa is of hearsay character, and the auditing judge has grave doubts whether it can be considered relevant testimony. Assuming, however, that testator did write to her and asked her to come to America and offered to send her a steamship ticket for her and her son and that she replied, "I don't like to come to the United States," the auditing judge does not consider that this evidence proves a desertion on her part. If he had actually sent her a steamship ticket, and had made a positive demand that she join him, and she had then positively declined to come, the situation would have been entirely different. He did not send her a ticket and she did not positively refuse to come. She merely stated that she did not like to come. If he had written back and told her he insisted on her coming, whether she liked it or not, and she had then declined to accede to his demand, a case of desertion would have been proved. But that is not the case. The auditing judge, therefore, rules that there was no desertion on her part and that she is entitled to one-half of the estate.

Is the widow entitled to the exemption? As already stated, testator left Italy in 1902 and came to America. He did not bring his wife and minor son with him. The record does not show the other circumstances in connection with the separation. The law always favors a finding of innocence rather than that of wrongdoing. It is not an uncommon occurrence for a married immigrant to come to this country first, and later, when he feels himself able to provide for his wife or wife and children in the country of his adoption, to send for her or them to join him. It is a fair presumption that the separation was intended to be but a temporary one. A temporary separation from the wife does not deprive the widow of the exemption. This is so well known that a citation of authorities is unnecessary. Before she can be deprived thereof, it must be shown that it was of a permanent character and so intended by both husband and wife. As the separation was in the beginning of a temporary character, the presumption is that it so continues. The burden of showing that it had changed to a permanent one, so intended by both parties, is upon him who so contends. This may be proved by showing an unexplained separation for many years: see Platt's Appeal, 80 Pa. 501.

If it be shown that the husband deserted his wife, the exemption is allowed: see Terry's Appeal, 55 Pa. 344. In the instant case, testator commenced to live with Grazia Ruccia approximately about 1908 and continued to live with her until the time of his death. He described her in his will as his "beloved companion," and a conveyance of real estate was made to him and her, and in this conveyance she is described as his wife. Taking into consideration this illegal relationship, coupled with the fact that he did not thereafter furnish his wife with support (in fact, he had not done so at any time after leaving Italy), in the opinion of the auditing judge, constitutes desertion on his part and was a voluntary abandonment of all the legal duties he owed to

his wife. But be that as it may, it shows that he did not desire his wife to join him and again constitute part of his family, and before she can be deprived of the exemption, the proof of fault on her side should be clear and convincing.

As already stated, the wife asked her husband to send her passage money to enable her to come to America, and it was not done. She was apparently without any means to pay for it herself; moreover, if she was, it was the duty of the husband to furnish money for that purpose. There is no proof that he did furnish her with the money or the ticket. It is true there is counter-evidence that he told her he would send her a steamship ticket if she would come to America and that she expressed her disinclination to come. Testator is dead and the wife is in Italy; and all the letters were written from about 1905 to 1908. It is difficult, after the lapse of so many years, to get to the exact truth, but there are two matters that are indisputable; one is that he never, after leaving Italy, supported his wife, and that after 1908 he lived continuously with the said Grazia Ruccia until the time of his death.

This case is substantially on all-fours with Balmforth's Estate, 26 Pa. Superior Ct. 491, except that in the case cited there was proof that the original separation constituted desertion. In that case the husband deserted his wife and minor children in 1883, came to Philadelphia and lived there until the time of his death in 1903. In the meantime, the wife supported herself and the children. She learned of his whereabouts some time after the desertion, but never received any communications from him, and could not write herself. She knew that her daughter had written several times, but did not know whether she received any reply. In the meantime, he contracted meretricious relations with another woman, and she was appointed executrix of his will. It was held that the wife had done all that was required of her to maintain the family relationship, and the exemption was allowed.

The auditing judge finds in the instant case that the wife did request her husband to provide her with the means of coming to America and that he did not do so. He is of opinion that she did all that was required of her to maintain a family relationship, and that she is entitled to the $500 exemption claim.

Counsel· for the widow objects to the credit claimed in the account of $500 for counsel fee. In the brief submitted by Mr. Friedman there is a statement of the services rendered and therein are included services chargeable to Grazia Ruccia in her individual, as distinguished from her representative, capacity. For example, counsel claims compensation for representing the estate in partition proceedings, and it is submitted that the amount of work done "in defending the account, as stated, is sufficient to justify the counsel fee asked." The statement of facts shows that the work was of a routine character, except that he represented the estate in scire facias proceedings issued by Carmine Di Battista, in Court of Common Pleas No. 5, June Term, 1929, No. 2170, on a judgment note executed by decedent in his lifetime to said Di Battista, and that he also filed an affidavit of defense in the suit of Carmine Di Battista against the estate in Common Pleas No. 4, December Term, 1929, No. 2938, for $500 on the note of decedent to plaintiff. No particulars are given in this connection. Counsel also claims compensation for services rendered in resisting the claim of the widow for her exemption and a one-half share of the estate. The accountant is not interested in the determination of these questions. She is but a stakeholder. Taking in con-

sideration the amount of the estate and the nature of the services rendered, the auditing judge fixes the fee at $300.

Mr. Miller, counsel for the widow, asked that the accountant be surcharged with the "value of business and stock, Mack truck and Ford car." The defense is that the stock and business, other than the Mack truck and Ford car, which are included in the inventory and appraisement and the account, were sold to Michael Cangi, the husband of one of the remaindermen, by testator in his lifetime, and that the accountant is, therefore, not chargeable with the value thereof.

Testator, as already stated, made his will on January 10, 1929. In the latter part of March, 1929, testator was in the hospital, sick in bed. The directing head being incapacitated, the business was temporarily discontinued. Michael Cangi testified on behalf of the accountant that he went to see the testator at the hospital on or about March 20th; that testator on that occasion offered to sell him "the business" or "the place, the stuff" that was in the junk place for $400; that this offer was accepted by him and he paid him the $400, and that he got the key to the place. Neither a bill of sale nor a writing acknowledging the receipt of the $400 was produced. This is the only evidence of the alleged sale. There was no testimony offered to show what became of the $400. The witness further testified that while Michael Celenza was sick in bed, the place was "shut down;" that he "reopened" it himself around May 20th; and that after that time he leased the property, put the telephone in his own name and since then has been conducting the business for himself. According to his own testimony, he did not take possession until May 20th of the stock; nor is there any evidence of any character to show that he held himself out to anybody, in the interim, as the owner of the property. It appears, however, from the testimony of Alfonso Dezii that he went to the business place three days before the death of testator and found it open. He mentioned the names of the persons who were on the premises and stated that "they were sorting the goods from the bad goods that were brought in there," and that "nothing was being bought or sold at that time, but they were doing that work of sorting out the merchandise."

Based on this testimony, the auditing judge finds as a fact that the business was discontinued from the time that testator went to the hospital until it was reopened May 20, 1929, that the said Michele Cangi had not taken possession of the business or stock prior to the death of testator or had made it publicly known that he had bought the business, and that the stock was in the possession of the estate.

Testator died, as already stated, on April 30, 1929. Both counsel notified the register of wills on May 13, 1929, that he should not grant letters testamentary or letters of administration upon the estate without notice to them. Letters testamentary were not granted until September 11, 1929. Mr. Friedman explained the delay was due to the fact that the will had been lodged with a notary public by testator with the understanding that it should not be read until ninety days after the testator's death, and that there was a further delay due to the fact that one of the witnesses to the will could not readily appear before the register. In the proceedings had in the common pleas court relating to the title to the real estate, Mr. Cangi was asked the following question: "Since Mr. Celenza's death, have you been running the junkshop for Grazia Ruccia?" The question was not directly answered. The reply was: "She rented it to me. She did not have money to get along with." That part of the answer that "she did not have money to get along

with" is apparently true. When testator died, Grazia Ruccia lost her provider. The record title of the property in which the junk business was conducted was in her name. Whether she had any income from any other source or not is not disclosed by the record. She probably did not. From his answer, it appears that the reason why the property was rented to him was because she was without means of support. If he had really bought the business, the probabilities are that he would have taken possession immediately after the alleged sale and would not have waited for a period of three weeks after the testator died to rent the place. Naturally, if he did buy the place, he would wish to make it productive. Instead of giving that as the reason, he gives a totally different reason.

Although, as already stated, testator was in possession of the property at the time of his death, and no one other than an administrator or an executor had any right to sell any of the stock, it was concluded that it would be better to open the place and resume business. The place was accordingly opened and Grazia Ruccia apparently took the word of Cangi that he had bought the stock; and this, notwithstanding the fact that the sum of $400 was totally inadequate, and that it was unreasonable to believe that testator had sold stock worth $10,000 approximately at least for $400. Although represented by counsel at that time, she allowed him to take possession of the goods and to sell them. She did not, as an ordinarily cautious person would do, say to the alleged purchaser, I am but a mere stakeholder, and I shall keep possession of the goods until it is legally determined whether they belong to the estate or to you. She allowed Cangi to convert the property to his own use, and if she is unable to recover from him the equivalent in value, she has no one to blame but herself. Incidentally, it might be noted that there is no testimony at what price the property was rented to Cangi and for what length of time; and no lease was produced to show that such a lease was actually made. A truthful story is usually accompanied by a wealth of detail, and a false story is not. There is a glaring lack of detail which would lend credibility to the alleged claim of ownership by Cangi.

When Grazia Ruccia qualified as executrix in September, 1929, it was her plain duty, in the opinion of the auditing judge, to proceed against Cangi, and in that testator was in possession of the stock at the time of his death, the burden of proving title was upon Cangi. Apparently the only testimony that there was a sale was that of Cangi himself, but as his interest was adverse to the estate, he could not testify in such a proceeding in his own behalf, and in a suit in the common pleas, under such circumstances, the verdict would necessarily have been in favor of the executrix. Grazia Ruccia, neither in her individual capacity nor a representative one, did anything to protect the estate from any loss, and, failing to do her duty, she is liable therefor. Grazia Ruccia, who is sought to be surcharged in this proceeding with a sum in excess of $12,000, does not in her own behalf give her version of the transaction. It is true Mr. Miller called her as a witness under cross-examination to testify to matters occurring after the death of testator, but Mr. Friedman, as her counsel, did not call her as a witness to testify to what occurred either during the lifetime or after the death of Michael Celenza. To say the least, such a situation is an extraordinary one. Persons who are wrongfully accused do not, as a rule, stand mute, and if they do, every intendment against them is to be made. The testimony that she did give under cross-examination was halting and evasive, and her demeanor was not such as to inspire confidence in the truthfulness of her testimony. Furthermore, it was only under stress of citation that she filed an inventory and appraisement

and an account, and there is nothing in the record to show that she gave notice to the three remaindermen of the fact that Mr. Miller, representing the widow, was contending that the stock in the place of business at the time of the death of testator belonged to him and that it was not sold to Mr. Congi. One of the three remaindermen is the wife of the alleged purchaser, and she probably knew. Whether the other two did or not the auditing judge is unable to say. If the executrix had a decent regard for their rights, she would have notified them as a matter of course. There is no direct proof of a conspiracy between Congi and the executrix to loot the estate. In the nature of things, such proof is inaccessible. A conspiracy to defraud, however, can be established by circumstantial evidence, and the auditing judge is of opinion that the circumstances of this case are such as to warrant such an inference. Be that as it may, it was the plain duty of the executrix to proceed against Congi, and she has not done so. The auditing judge, therefore, rules that she must be surcharged with the value of the stock in the junk place at the time of the death of testator.

*Ira Jewell Williams*, for exceptant; *E. Spencer Miller*, contra.

SINKLER, J., February 16, 1932.—The exceptions to the adjudication of the auditing judge were argued before the court *in banc* in May, 1931; likewise the petition for a review of the adjudication and the answer thereto. The latter involved the accuracy of a translation from the Italian language into English of a letter of attorney given by the widow of the decedent to represent her in asserting her rights against the decedent's estate. It was suggested that some agreement might be reached between the parties as to an accurate translation or the making of a new translation by a party to be agreed upon. For these and other reasons we have been requested to delay in rendering our decision both upon the exceptions to the adjudication and the petition for a review thereof. Counsel having been unable to adjust their sundry difficulties, our decision is now rendered.

The auditing judge has made an exhaustive study of the many questions of law and fact submitted to him, and in our opinion has reached a correct determination thereof. His first conclusion relates to the question raised by counsel for the accountant whether the letter of attorney confers upon the attorney in fact the right to make an election to take against the decedent's will. The letter of attorney is not in terms or in effect a general one. The powers contained in it relate only to the rights of the widow in the estate of her deceased husband. The auditing judge finds that no specific authority to make an election is conferred upon the attorney in fact, but that the language of the letter of attorney is sufficiently broad to confer upon the attorney in fact every power necessary to be exercised in relation to the marital rights of the widow in her husband's estate, and that it is, therefore, sufficient in its terms to authorize the execution by the attorney in fact of the election to take against the will. The clauses of the letter of attorney quoted in the adjudication sustain this finding. Another clause not quoted in the adjudication authorizes the attorney in fact "to execute all judicial and legal papers, or papers not legal or judicial." The finding of the auditing judge is correct.

The next conclusion reached by the auditing judge is likewise in our judgment correct. It was contended on behalf of the accountant that a surviving spouse cannot by his or her duly authorized attorney avail of the rights conferred by section 23 (b) of the Wills Act of 1917, P. L. 410, as amended by the Act of April 2, 1925, P. L. 118. It is contended that the statute requires the signature of the principal himself, that it requires the exercise of discretion, and that the exercise of discretion may not be delegated to an agent.

The brief of argument filed in behalf of the accountant upon this subject, the main question for determination, indicates learning and industry. The references in his brief to works of English commentators upon the subject and to certain decisions (the cases of Hinton *v.* Hinton, 28 N. C. 274, and Cook *v.* Bennett, 207 Ky. 837) are in point. The brief of counsel for the widow also shows labor and ability. He relies upon the general maxim of law, *"Qui facit per alium per se ipsum facere videtur,"* and cites from the works of American commentators upon the subject, and numerous cases which are in point, for example, Whitley Partners, Ltd., 32 Ch. Div. 337. There a British statute provided that articles of partnership shall be signed by each subscriber in the presence of and arrested by one witness at least, and it was held that there had been a sufficient compliance with the statute by the signing of his name by one partner through an agent. We consider that the decisions in this state upon the subject of election by a surviving spouse to take against the will of a deceased spouse govern in the present case. It is pointed out by the auditing judge, and as well by counsel for both the accountant and the widow, that under these decisions the right of election cannot be exercised after the death of a surviving spouse by the personal representatives, but the guardian of a lunatic surviving spouse may, with the permission of the appropriate court, execute an election, as may the guardian of a surviving spouse who is not of full age. The execution of any instrument by an attorney in fact may be the subject of scrutiny by reason of the circumstances under which it was executed. The auditing judge has held that under the circumstances existing in the present case, the execution of the election by an attorney in fact is valid. In this conclusion we concur.

Another question brought before the auditing judge is whether the wife by her desertion of the decedent has forfeited her rights as surviving spouse. The testimony on this point is conflicting. The finding of the auditing judge is not to be set aside unless manifest error is shown, and such we do not find to be the case. Likewise, as to the exemption, we do not find that the auditing judge has fallen into such error as would justify the sustaining of the exceptions filed to his finding upon this point.

The final question raised by the exceptions is whether the accountant has been properly surcharged with certain items set forth in the adjudication. In this respect, also, we consider the finding of the auditing judge to have been correct.

The petition for review alleges that certain passages in the translation of the letter of attorney from the Italian language into the English language are not correct, and that the auditing judge relied upon an erroneous translation in his adjudication. The petition sets forth the two translations in parallel columns. The answer thereto admits that the translation relied upon by the widow is more discursive than is required by the original, and sets up in reply that neither of the passages quoted conveys a materially different purport from the version contained in the petition. As to the discrepancy between the translation of the letter of attorney relied upon by the auditing judge and that now offered in behalf of the accountant, we do not find any material difference. The effect of both translations is the same, to wit, to authorize the attorney in fact to do all necessary things in asserting the marital rights of the widow against her husband's estate, ratifying and confirming all that her attorney in fact might do in this respect.

The petition for review further sets forth that the witness Dezii when first called to testify was dismissed from the witness stand and threatened with criminal prosecution for perjury in relation to his testimony then offered, and

that in spite of this, at a subsequent hearing, he was permitted to testify as to certain matters. The answer admits that the auditing judge first entertained an unfavorable opinion of the witness, who, as the court supposed, sought to read as an original a fairly written copy of a certain inventory, but that when the witness produced the original, a pencil-written list, at a later date, and testified fully as to the contents, the auditing judge was satisfied as to his veracity. The petition for review further avers that the testimony of the witness Dezii is false and fraudulent, and the answer recites that the matters alleged were open for consideration before the auditing judge, and that the facts are immaterial because the accountant does not deny that the inventory is correct. As to the reliability of the witness Dezii, the auditing judge, before whom he appeared, was best qualified to form an opinion. Nothing is found in the testimony of this witness which leads us to believe that the auditing judge has erred in his reliance upon this testimony and the conclusions reached therefrom.

The exceptions to the adjudication are dismissed and the adjudication is confirmed absolutely. The prayer of the petition for review is denied.